IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Nina Y. Wang

Civil Action No. 24-cv-02406-NYW-TPO

JESSICA CALDERON,

    Plaintiff,

v.

CITY AND COUNTY OF DENVER, OFFICE OF THE MAYOR,
BEN SANDERS, in his official and individual capacities, and
BRIAN FIROOZ, in his official and individual capacities,

    Defendants.

---

## ORDER ON MOTION FOR TEMPORARY RESTRAINING ORDER

---

This matter is before the Court on Plaintiff's Motion for Temporary Restraining Order ("Motion for TRO" or "Motion"). [Doc. 41]. This Court held a hearing on the Motion on September 17, 2025. [Doc. 52]. For the reasons set forth in this Order, the Motion for TRO is respectfully **GRANTED**.

## BACKGROUND

The Court draws these facts from the preliminary injunction record and limits its discussion of the facts to those most relevant to the instant Motion. Plaintiff Jessica Calderon ("Plaintiff" or "Ms. Calderon") has worked for the City and County of Denver ("City") since 2004. [Doc. 43 at ¶ 3; Doc. 40-1 at ¶ 3]. At all times relevant, she worked as the Director of Operations and Innovation in the Office of Social Equity & Innovation ("OSEI") in the Office of the Mayor. [Doc. 40-1 at ¶ 7].

**Plaintiff's Employment and Alleged Protected Activity.** During the 2023 mayoral election, Ms. Calderon supported Dr. Lisa Calderon. [*Id.* at ¶ 17]. Dr. Calderon

is the founder and leader of Latinos United Neighbors Association ("LUNA"), a Latino community organization. [*Id.* at ¶ 19]. Dr. Calderon did not qualify for the runoff election and endorsed Mayor Johnston, who won. [*Id.* at ¶¶ 18, 23]. Mayor Johnston knew Plaintiff was associated with Dr. Calderon and LUNA. [*Id.* at ¶ 22].

In July 2023, Plaintiff applied for but did not receive the Chief Equity Officer ("CEO") position under Mayor Johnston. [*Id.* at ¶ 74]. Instead, Defendant Ben Sanders ("Mr. Sanders") was selected as CEO of OSEI. [*Id.* at ¶ 78]. Plaintiff alleges that Mr. Sanders "repeatedly confronted, criticized, and threatened her" about her affiliation with LUNA and Dr. Calderon, who was critical of Mayor Johnston and his administration. [*Id.* at ¶¶ 85–90]. Mr. Sanders told Plaintiff that her association with Dr. Calderon "could reflect poorly on" her, that she "need[ed] to decide what [she] would do regarding [her] association with Dr. Calderon and [her] role as a LUNA member," and that she could not "be on both sides of the table." [*Id.* at ¶ 90]. Plaintiff felt that Mr. Sanders and the City were threatening her job, so she stopped attending LUNA meetings. [*Id.* at ¶ 94].

In September 2023 and February 2024, Mr. Sanders gave Plaintiff reduced performance ratings. [*Id.* at ¶¶ 95–96]. Plaintiff also applied for a Deputy position under Mayor Johnston, but Mr. Sanders selected Defendant Brian Firooz ("Mr. Firooz") instead. [*Id.* at ¶¶ 99–101]. Plaintiff alleges that Defendants took various actions to "undermine" her position between June 2024 and August 2025, such as (1) continually criticizing and scrutinizing a position on her team, which she characterizes as an "attempt[] to reduce the positions on [her] team," [*id.* at ¶¶ 109, 122]; (2) failing to support her efforts to maintain a full-time position on her team, which resulted in the position being eliminated, [*id.* at ¶¶ 114–18]; and (3) excluding her from key OSEI meetings directly related to her

2

job duties and other processes, [*id.* at ¶¶ 119–21]. Mr. Sanders and Mr. Firooz also failed to recognize Ms. Calderon's accomplishments publicly. [*Id.* at ¶¶ 150–53].

In August 2024, Plaintiff filed this lawsuit. [Doc. 1]. On November 18, 2024, Ms. Calderon complained to Mr. Firooz that she did not feel supported at work, and On November 20, 2024, she told Mr. Firooz that Mr. Sanders was "trying to push [her] out." [Doc. 40-1 at ¶¶ 131–32]. In response, Mr. Firooz "discussed retaliatory topics" such as increase scrutiny of Ms. Calderon and removing Ms. Calderon from attending meetings of the Policy Committee, despite having directed her to attend or allowed her to attend the meetings previously. [*Id.* at ¶ 133]. Mr. Firooz told Ms. Calderon that "someone from the Mayor's Office" asked Mr. Sanders to remove an individual from the Policy Committee. [*Id.* at ¶ 134]. Mr. Firooz provided Ms. Calderon with negative feedback on topics like multitasking and asking too many questions in meetings. [*Id.* at ¶ 135].

Ms. Calderon filed her First Amended Complaint on November 20, 2024, [Doc. 9], which she prompted Mr. Firooz to "angrily confront[]" Plaintiff about being mentioned in the lawsuit, [Doc. 40-1 at ¶¶ 137–39]. After Ms. Calderon filed her Amended Complaint, Mr. Firooz claimed that she had put a target on him, "created a hostile environment" for him, and that he was going to "see if [he could] do something about it," which Ms. Calderon understood as a threat. [*Id.* at ¶¶ 140–42]. During winter 2025, Ms. Calderon alleges that Mr. Firooz gave her the lowest performance rating of her career. [*Id.* at ¶¶ 154–55].

In June 2025, the City issued a public notice proposing rule changes for anticipated layoffs. [*Id.* at ¶ 159]. One such proposal was the elimination of seniority as a factor in layoff decisions. [*Id.*]. Ms. Calderon submitted comments opposing these changes. [*Id.*

3

at ¶ 160].

***The Layoff.*** On August 18, 2025, Ms. Calderon met with Mr. Sanders and a City HR representative, Veronica Lipsey, who told her that she was included in the layoffs and her position would be eliminated. [*Id.* at ¶ 5]. Ms. Calderon appealed the decision to the City's Career Service Board, arguing the City failed to (1) apply the applicable matrix factors to her, (2) properly "rank" her (presumably using the matrix) as slated for the layoff, and (3) consider her seniority. [*Id.* at ¶ 168]. On August 27, 2025, Ms. Calderon met with Mr. Firooz and Ms. Lipsey, who stated that they had applied the matrix factors to "rank" Ms. Calderon in the layoff. [*Id.* at ¶¶ 170–71]. Ms. Calderon's salary and benefits will terminate on September 18, 2025. [*Id.* at ¶ 6].

Ms. Calderon filed an unopposed motion to amend her pleading to add allegations regarding the layoff, [Doc. 39], which the Court granted, [Doc. 42]. In her Second Amended Complaint, Ms. Calderon brings seven claims:

(1)  hostile work environment under Title VII, against the City;

(2)  national origin discrimination under Title VII, against the City;

(3)  retaliation under Title VII, against the City;

(4)  First Amendment retaliation under 42 U.S.C. § 1983 based on Ms. Calderon's support for Dr. Calderon and LUNA, against the City and Defendant Sanders;

(5)  sex discrimination under the Equal Protection Clause and § 1983, against the City and Defendant Sanders;

(6)  First Amendment retaliation under § 1983 based on Ms. Calderon's right to petition by filing this lawsuit, against the City and Defendants Sanders and

4

    Firooz; and

    (7)    sex discrimination under Title VII, against the City.

[Doc. 43 at ¶¶ 176–284]. Ms. Calderon seeks (1) declaratory relief stating that various actions by the City were unlawful, (2) compensatory and punitive damages (including non-economic damages), and (3) either reinstatement or front pay. [*Id.* at 44–45].

Ms. Calderon now moves for preliminary injunctive relief on her First Amendment claims.[1] [Doc. 40 at 6; Doc. 41]. She asks the Court to "require Defendants to maintain her salary, benefits, and employment status until this action is resolved by settlement or jury verdict." [Doc. 41 at 2]. Defendants oppose Plaintiff's request. [Doc. 49].

## LEGAL STANDARD

Federal Rule of Civil Procedure 65 authorizes the Court to enter preliminary injunctions and issue temporary restraining orders. Fed. R. Civ. P. 65(a), (b). "The requirements for issuing a [temporary restraining order] mirror the requirements for issuing a preliminary injunction." *Briscoe v. Sebelius*, 927 F. Supp. 2d 1109, 1114 (D. Colo. 2013). "Preliminary injunctions are extraordinary remedies requiring that the movant's right to relief be clear and unequivocal." *Planned Parenthood of Kan. v. Andersen*, 882 F.3d 1205, 1223 (10th Cir. 2018). A party seeking preliminary injunctive

---

[1] As mentioned during the September 17 hearing, this Court notes that the Motion for TRO improperly incorporates by reference the arguments made in the Motion for Preliminary Injunction. *See* [Doc. 40; Doc. 41]. Plaintiff cites no rule that allows for such incorporation, and this Court also knows of none. Courts thus routinely reject litigants' attempts to incorporate arguments from other filings "in lieu of fully setting forth their arguments before [the] court." *In re Antrobus*, 563 F.3d 1092, 1097 (10th Cir. 2009). The Court did not strike the Motion due to the exigency of the effective date of Ms. Calderon's separation from her employment. Fed. R. Civ. P. 1. But as this case moves forward, all Parties are advised that failure to comply with the Federal Rules of Civil Procedure, the Local Rules of Civil Practice, or the Court's Uniform Practice Standards may lead to the striking of a motion without substantive consideration.

relief must satisfy four factors: (1) a likelihood of success on the merits; (2) a likelihood that the movant will suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the movant's favor; and (4) that the injunction is in the public interest. *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1260 (10th Cir. 2004).

A "plaintiff's failure to prove any one of the four preliminary injunction factors renders its request for injunctive relief unwarranted." *Vill. of Logan v. U.S. Dep't of Interior*, 577 F. App'x 760, 766 (10th Cir. 2014). And "because a showing of probable irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction, the moving party must first demonstrate that such injury is likely before the other requirements for the issuance of an injunction will be considered." *Dominion Video Satellite*, 356 F.3d at 1260 (brackets and quotation omitted).

## ANALYSIS

### I. Whether the Requested Injunction Is Disfavored

The Court begins with Defendants' argument that Plaintiff's Motion is a disfavored injunction that warrants a heightened standard of proof. *See* [Doc. 49 at 9–11]. The United States Court of Appeals for the Tenth Circuit ("Tenth Circuit") has identified three types of disfavored preliminary injunctions: "(1) preliminary injunctions that alter the status quo; (2) mandatory preliminary injunctions; and (3) preliminary injunctions that afford the movant all the relief that it could recover at the conclusion of a full trial on the merits." *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1259 (10th Cir. 2005). If the requested injunction falls into one of these categories, the movant must "make a strong showing both with regard to the likelihood of success on the merits and with regard to the balance

6

of harms." *Fish v. Kobach*, 840 F.3d 710, 724 (10th Cir. 2016) (cleaned up).

Defendants argue that ordering the City to maintain Plaintiff's employment would be a mandatory injunction and grant Plaintiff all the relief she could obtain at trial. [Doc. 49 at 10]. The Court respectfully disagrees. With respect to the mandatory injunction argument, "[a]n injunction is mandatory when it requires defendants to do something they were not doing during the most recent peaceable status quo—that is, the last uncontested period preceding the injunction." *Pryor v. Sch. Dist. No. 1*, 99 F.4th 1243, 1255 (10th Cir. 2024).[2] Here, it is undisputed that Plaintiff's employment continues through September 18, 2025, so the last peaceable status quo includes the City employing Plaintiff and Plaintiff receiving her salary and benefits. That is true regardless of whether the status quo is measured from when Plaintiff filed this suit or when Plaintiff filed her Motion. *See Pryor*, 99 F.4th at 1255 (holding that last peaceable status quo existed before the plaintiff was terminated from his volunteer position, when he enjoyed the benefits of his role). Nor would enjoining Plaintiff's termination grant her all the relief she could obtain at trial. For instance, she seeks non-economic and punitive damages on her Title VII claims that would not be encompassed by her ordinary employment benefits. [Doc. 43 at 45–46]. Accordingly, the Court respectfully concludes that Plaintiff's requested injunction is not the type of disfavored relief that would require her to make a heightened showing on the

---

[2] The Court notes that neither side cited *Pryor* within their written briefs. *See* [Doc. 40; Doc. 41; Doc. 49]. To facilitate the most efficient resolution of matters before it, the Court encourages the Parties to submit all authority in written briefing promptly and reminds the Parties that the Court has no obligation to perform legal research or craft arguments on behalf of any Party—particularly when the Parties are represented by able counsel. *See United States v. Davis*, 622 F. App'x 758, 759 (10th Cir. 2015) ("[I]t is not this court's duty, after all, to make arguments for a litigant that he has not made for himself."); *Phillips v. Hillcrest Med. Ctr.*, 244 F.3d 790, 800 n.10 (10th Cir. 2001) (observing that a court has no obligation to make arguments or perform research on behalf of litigants).

7

first two prongs of the preliminary injunction analysis.

## II.     Preliminary Injunction Factors

Plaintiff moves for temporary injunctive relief on her First Amendment claims and her Title VII retaliation claim. [Doc. 40 at 6]. The Court addresses each type of claim in turn.

### A.     Title VII Claims

To the extent Plaintiff seeks injunctive relief on her Title VII retaliation claim, she cannot establish irreparable harm. The Supreme Court has advised that, ordinarily, the financial hardships or difficulties caused by "factors common to most discharged employees and not attributable to any unusual actions relating to the discharge itself—will not support a finding of irreparable injury, however severely they may affect a particular individual." *Sampson v. Murray*, 415 U.S. 61, 92 n.68 (1974). *Sampson* explains that irreparable harm based on a termination of employment will only be found in the "genuinely extraordinary situation" in which the "circumstances surrounding an employee's discharge, together with the resultant effect on the employee, may so far depart from the normal situation that irreparable injury might be found." *Id.* Although the Tenth Circuit has never applied this portion of *Sampson*, the weight of out-of-circuit authority holds that legal remedies—including backpay and reinstatement—are generally an adequate remedy for the termination of employment and associated benefits. *See, e.g.*, *Together Emps. v. Mass Gen. Brigham Inc.*, 19 F.4th 1, 8 (1st Cir. 2021) ("When litigants seek to enjoin termination of employment, money damages ordinarily provide an appropriate remedy."); *Halczenko v. Ascension Health, Inc.*, 37 F.4th 1321, 1323 (7th Cir. 2022) ("[T]he possibility of reinstatement or back-pay at the end of litigation . . . is usually

8

enough to show that preliminary injunctive relief is unnecessary." (Title VII case)); *Overstreet v. Lexington-Fayette Urb. Cnty. Gov't*, 305 F.3d 566, 579 (6th Cir. 2002) ("[T]he loss of a job is quintessentially reparable by money damages." (quoting *Minn. Ass'n of Nurse Anesthetists v. Unity Hosp.*, 59 F.3d 80, 83 (8th Cir. 1995)).

Upon consideration of Plaintiff's Motion and oral arguments, Plaintiff's testimony in her Declaration, and the record as a whole, the Court finds that Plaintiff has not demonstrated that her case is the "genuinely extraordinary situation" where the loss of employment and benefits cannot be remedied with money damages. *See Sampson*, 415 U.S. at 92 n.68. Although the Court does not discount the hardship that Plaintiff may face from the loss of her job, she has not established that these hardships are anything beyond the difficulties that an employee ordinarily faces when losing her job and associated benefits. Nor has Plaintiff demonstrated that these hardships cannot be compensated with money damages or remedied with reinstatement, should she ultimately prevail on her claims. Accordingly, the Court finds that Plaintiff has not established a likelihood of irreparable harm with respect to her Title VII claim. The Motion is respectfully **DENIED** insofar as Plaintiff seeks a temporary restraining order as to her Title VII retaliation claim.

B.   **First Amendment Claims**

Plaintiff also seeks injunctive relief on her First Amendment claims. [Doc. 40 at 6]. In Plaintiff's view, the relevant expressive activity is Plaintiff's "(1) support[] [for] Dr. Lisa Calderon in her campaign for Mayor of Denver, (2) associating and advocating with Dr. Calderon through LUNA, and (3) associating and advocating with LUNA's mission and goals." [*Id.* at 8].[3]   Plaintiff contends that permitting Defendants to carry out her

---

[3] Because Plaintiff appears to limit her arguments to her free association claim, [Doc. 40

9

termination would inflict an irreparable injury to her exercise of these First Amendment rights. [*Id.* at 18]. "When a plaintiff is asserting an injury in the form of a violated constitutional right, [courts] presume that the injury will be irreparable if it exists." *Ortega v. Grisham*, --- F.4th ---, 2025 WL 2394646, at *3 (10th Cir. Aug. 19, 2025) (citing *Elrod v. Burns*, 427 U.S. 347, 373–74 (1976)). In such a case, the first and second preliminary injunction factors collapse into a single inquiry, "equating likelihood of success on the merits with a demonstration of irreparable injury." *Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 806 (10th Cir. 2019). The Court thus considers whether Plaintiff is likely to succeed on her First Amendment claims.

When a plaintiff brings a First Amendment claim based on retaliation by a government employer, courts apply the test outlined in *Pickering v. Board of Education*, 391 U.S. 563, 568 (1968), and *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006) ("*Pickering/Garcetti* test"). *See Trant v. Oklahoma*, 754 F.3d 1158, 1165 (10th Cir. 2014). The *Pickering/Garcetti* test includes five factors:

> (1) whether the speech was made pursuant to an employee's official duties; (2) whether the speech was on a matter of public concern; (3) whether the government's interests, as employer, in promoting the efficiency of the public service are sufficient to outweigh the plaintiff's free speech interests; (4) whether the protected speech was a motivating factor in the adverse employment action; and (5) whether the defendant would have reached the same employment decision in the absence of the protected conduct.

*Id.* (quotation omitted); *Pryor*, 99 F.4th at 1250. The first three factors present questions of law, and the fourth and fifth factors present questions of fact. *Pryor*, 99 F.4th at 1250.

### 1. Speech Pursuant to Official Duties

---

at 9–10], the Court does the same, *see United States v. Davis*, 622 F. App'x 758, 759 (10th Cir. 2015) ("[I]t is not this [C]ourt's duty, after all, to make arguments for a litigant that he has not made himself.").

The first *Pickering/Garcetti* factor looks to whether Plaintiff engaged in speech pursuant to her official duties. Although a government employer may control speech within an employee's official duties, that control does not extent to participation in discourse as a citizen and outside the employee's official duties. *Id.* at 1251. "The critical question is not whether the speech related to the official duties, but whether it was within the scope of the employee's work tasks that the employer paid him to perform." *Id.*

Here, Plaintiff's Declaration suggests that her association with and support for LUNA and Dr. Calderon occurred outside her official duties. For instance, in June 2023, Plaintiff "joined with LUNA to discuss which candidate to endorse and met with Mayor Johnston." [Doc. 40-1 at ¶ 21]. Regarding the other relevant LUNA meeting, a "scorecard meeting" in October 2023, Plaintiff avers that she "took paid time off" to attend the meeting, which included Mayor Johnston, Mr. Sanders, and Dr. Calderon. [*Id.* at ¶ 85]. Moreover, Plaintiff's Declaration suggests that Defendants—particularly Mr. Sanders—in fact *disapproved* of her affiliation with LUNA and Dr. Calderon. *See* [*id.* at ¶¶ 88–92]; *see also Pryor*, 99 F.4th at 1251 (finding that first factor weighed in favor of plaintiff where letter from employer demonstrated that plaintiff's role did not give him authority to over topics on which plaintiff had spoke). Defendants do not address this testimony or contend that Plaintiff's association with LUNA and Dr. Calderon occurred within the scope of Plaintiff's work tasks that she was paid to perform. [Doc. 49 at 12]. Nor is there evidence that specifically delineates Plaintiff's duties, if any, that would have included LUNA. *Pryor*, 99 F.4th at 1251 ("Without record evidence of Plaintiff's official responsibilities, we have no foundation for holding that Plaintiff's speech in question was a part of his official responsibilities."). Accordingly, the Court concludes that the first *Pickering/Garcetti* factor

weighs in Plaintiff's favor at this stage.

### 2.      Speech About a Matter of Public Concern

The second *Garcetti/Pickering* factor considers whether Plaintiff's speech related to a matter of public concern. "Speech is a matter of concern if it is of interest to the community." *Trant*, 754 F.3d at 1165 (quotation omitted). The Court accounts for the "content, form, and context" of the relevant speech. *Pryor*, 99 F.4th at 1251 (quotation omitted).

Plaintiff contends that her expressive activity involved matters of public concern because it relates to Dr. Calderon's mayoral campaign and issues of local government. [Doc. 40 at 9]. The Court respectfully agrees. Based on Plaintiff's undisputed Declaration, LUNA is a "grassroots community organization" involved in local elections—including the 2023 mayoral election that Dr. Calderon and Mayor Johnston participated in—and generally seeks to maintain a "dialogue with elected officials designed to advance the issues of its constituency." [Doc. 40-1 at ¶¶ 19–20]. Speech about candidates and issue-based elections is at the "core of the protection afforded by the First Amendment." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 346–47 (1995). And to the extent Plaintiff's association with LUNA included speech about local government and community issues, these are issues of "political, social or other concern to the community" that constitute a matter of public concern. *Mella v. Mapleton Pub. Schs.*, 152 F. App'x 717, 721 (10th Cir. 2005). Again, Defendants do not dispute that Plaintiff's expressive activity related to matters of public concern. *See generally* [Doc. 49]. The Court respectfully concludes that the second *Pickering/Garcetti* factor weighs in Plaintiff's favor at this stage.

### 3. The Government's Interest in Efficiency

The third factor considers whether the City's interests as an employer in promoting efficiency outweigh Plaintiff's free speech interests. This factor favors an employee "unless the employer shows that some restriction is necessary to prevent the disruption of official functions or to insure effective performance by the employee." *Dixon v. Kirkpatrick*, 553 F.3d 1294, 1304 (10th Cir. 2009) (quotation omitted). Put differently, "the question is whether the employer has an efficiency interest which would justify it in restricting the particular speech at issue." *Id.* (quotation omitted).

Plaintiff asserts that there was no need to limit her association with LUNA and Dr. Calderon because such association "did not cause any disruption to the Defendants' operations." [Doc. 40 at 9]. Plaintiff herself avers that she told Defendant Sanders that her "employment with the City was separate from Dr. Calderon's conduct and statements." [Doc. 40-1 at ¶ 92]. Defendants do not address or dispute this point. *See* [Doc. 49]. Because Defendants do not contend that placing restrictions on Plaintiff—let alone terminating her—was necessary to mitigate any disruption caused by Plaintiff's speech, the Court respectfully concludes that Plaintiff's free speech interests outweigh the City's efficiency interests in this context.[4]

### 4. Defendants' Intent in Terminating Plaintiff

The fourth and fifth *Pickering/Garcetti* factors are "questions of fact that turn on the non-movant's intent." *Pryor*, 99 F.4th at 1253. The fourth factor is whether the speech

---

[4] The Court recognizes Defendants' contention that Plaintiff's termination was not caused by her expressive activities and instead necessitated by the City's ongoing layoffs. *E.g.*, [Doc. 49 at 12–14]. The Court addresses these arguments at other portions of the analysis.

was a substantial or motivating factor in the adverse employment decision.  *Trant*, 754 F.3d at 1166.  Circumstantial evidence indicating a retaliatory motive may include "temporal proximity, intervening antagonism or retaliatory animus, inconsistencies in the employer's articulated reason for taking adverse action, or any other evidence of record sufficient to support the inference of causality."  *Tonjes v. Park Cnty. Sheriff's Off.*, 300 F. Supp. 3d 1308, 1330 (D. Colo. 2018) (quotation omitted).

Defendants' arguments focus on the causation issue.  They argue that they "faced an unprecedented budget crisis and developed a City-wide layoff plan to address it." [Doc. 49 at 12].  Defendants contend that because Plaintiff was laid off pursuant to the layoff plan, she cannot show her termination was "accompanied by evidence of improper motive."  [*Id.*].  The Court respectfully disagrees.

Plaintiff's Declaration describes a series of adverse or antagonistic actions taken against Plaintiff that can be reasonably traced back to her association with LUNA and Dr. Calderon.  *See* [Doc. 40-1].  Defendants generally do not dispute Plaintiff's account, despite the fact that such information related to her employment is firmly within their possession custody control.  *See* [Doc. 49].

First, in late October 2023, Plaintiff and Mr. Sanders attended a LUNA meeting where Dr. Calderon was "highly critical" of Mayor Johnston.  [Doc. 40-1 at ¶¶ 85–87]. Beginning in December 2023, Mr. Sanders repeatedly made statements to Plaintiff expressing that, among other things, he needed to "trust" Plaintiff and her association with Dr. Calderon could "reflect poorly" on her.  [*Id.* at ¶ 90].  According to Plaintiff, Mr. Sanders told her that "it would not be a good look for [her] to associate with LUNA."  [*Id.*]. In February 2024, Mr. Sanders gave Plaintiff a reduced performance rating without

14

discussing the rating with Plaintiff. [*Id.* at ¶¶ 96–97]. In April 2024, Mr. Sanders selected Mr. Firooz as Deputy of OSEI—a purportedly apolitical position—over Plaintiff, based on Mr. Firooz's political support for Mayor Johnston. [*Id.* at ¶¶ 98–101]. Throughout summer 2024, Plaintiff avers that she was denied funding and support for her programming, and excluded from key meetings "directly related to [Plaintiff's] job duties." *See* [*id.* at ¶¶ 109–30]. In November 2024, Plaintiff was removed from the "Policy Committee" and angrily confronted by Mr. Firooz about this lawsuit. *See* [*id.* at ¶¶ 131–42]. In February 2025, Mr. Firooz gave Plaintiff the lowest performance rating of her career. [*Id.* at ¶¶ 154–55]. These numerous incidents of "intervening antagonism" between Plaintiff's protected activity and her ultimate termination support Plaintiff's claim that her political associations were a motivating factor in her dismissal. *See Walton v. Powell*, 821 F.3d 1204, 1214 (10th Cir. 2016) (finding that evidence of government official's awareness of plaintiff's political affiliations, combined with temporal proximity and "the campaign of harassment from the first day of his new administration," supported an inference of retaliatory motive).

Defendants' counterargument, that Plaintiff's termination was necessitated by the layoffs and governed by the four-factor matrix, does not refute Plaintiff's testimony. Defendants contend that OSEI followed the four-factor matrix "when weighting its criteria and applied the criteria uniformly across all necessary selections." [Doc. 49 at 12]. But the matrix as applied to Plaintiff does not necessarily prove this. *See* [Doc. 49-2 (matrix as applied to Plaintiff and another Director); Doc. 49-7 (instructions for matrix)]. It appears that the matrix required Plaintiff's supervising official—Mr. Firooz—to score Plaintiff based on the four factors and then "rank" her against another comparable "Director" to determine who would be laid off and who would be retained. [Doc. 49 at 4–6; Doc. 49-2]. Plaintiff

15

outscored the other employee on the first two factors—length of service and average "Overall Performance." [Doc. 49-2]. These factors appear to leave no discretion to the supervising official—they simply direct the official to compute a score based on the length of service or average performance scores between 2022 and 2024. [Doc. 49-7]. The other two factors, however, direct the supervising official to rate the employee between one and five for "Skills" and "Abilities." [*Id.*]. And Mr. Firooz assigned significantly lower scores to Plaintiff than the other employee, causing the other employee to be recommended for retention and Plaintiff to be recommended for layoff. [Doc. 49-2]. Plaintiff also asserts that the retained employee had a tenure of only ten months and no history of performance ratings. [Doc. 40-1 at ¶ 172; Doc. 49-2]. At bottom, the Court finds at this stage that the four-factor matrix is not a purely objective criterion that dispels the inference of retaliatory motive raised by Plaintiff's testimony.

The Court additionally notes that Plaintiff asserts an inconsistency in the City's reasons for her termination. She was first told, both in a meeting with Mr. Sanders and in a letter, that her "position was abolished," with no mention of the ranking or the matrix. [Doc. 40-1 at ¶¶ 165, 168–171]. Only after Plaintiff appealed to the Board did Defendants explain that they had applied the matrix to her. [*Id.*].

To be sure, this issue will require further factual and legal development. The Parties' arguments do not directly address the *Pickering/Garcetti* standard, and it is unclear how Plaintiff's First Amendment free association claim interacts with her other claims. But based on the evidence before the Court at this stage, particularly the inconsistent statements regarding Plaintiff's termination, the room for discretion in the four-factor matrix, and the series of alleged antagonistic actions against Plaintiff leading

16

up to her layoff—some of which explicitly involved her political associations—the Court finds that the fourth *Pickering/Garcetti* factor favors Plaintiff.

For substantially the same reasons, the Court finds that the fifth factor—whether Defendants would have made the same decision absent the protected conduct—weighs in favor of Plaintiff. Having found that Plaintiff has established a likelihood that her termination was motivated by her political associations, the Court cannot conclude that Defendants would have taken the same actions if she were not associated with LUNA and Dr. Calderon. The record does not suggest that Plaintiff's position was doomed for elimination—rather, either Plaintiff or the comparable employee could have been retained, and Mr. Firooz applied the four-factor matrix in a way that led to Plaintiff's termination. [Doc. 49-7]. Again, the Court emphasizes that the record is relatively undeveloped and the Parties' briefing does not address this point. The strength of Plaintiff's case may change dramatically before the Court decides the Motion for Preliminary Injunction. [Doc. 40]. But based on Plaintiff's Declaration, the Parties' arguments, and the record as a whole at this stage, the Court concludes that the fifth factor favors Plaintiff.

Because all five *Pickering/Garcetti* factors favor Plaintiff, the Court finds that Plaintiff has established a likelihood of success on the merits with respect to her First Amendment claim based on her right to free association. Plaintiff has thus satisfied the first two requirements for the issuance of a temporary restraining order. *See Free the Nipple*, 916 F.3d at 806.

### C. Other Preliminary Injunction Factors

Finally, the Court considers the final two preliminary injunction factors—balance of

the equities and public interest. "These factors merge when the [g]overnment is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009)). And "[w]hen a constitutional right hangs in the balance, . . . even a temporary loss usually trumps any harm to the defendant." *Free the Nipple*, 916 F.3d at 806 (quotation omitted). Similarly, "it's always in the public interest to prevent the violation of a party's constitutional rights." *Id.* at 807 (quotation omitted); *see also Pac. Frontier v. Pleasant Grove City*, 414 F.3d 1221, 1237 (10th Cir.2005) ("Vindicating First Amendment freedoms is clearly in the public interest.").

This is not to say that the City and the public have no interest in terminating Plaintiff's employment. Defendants assert that the City's layoffs are prompted by an "unprecedented budgetary crisis." [Doc. 49 at 12–13]. In their view, granting the Motion would "erode[] the fiscal integrity of the layoff plan and the Mayor's budgetary goals." [*Id.* at 14]. Defendants also fear that enjoining Plaintiff's termination could inspire other employees to sue in an attempt to "block or delay" the layoffs. [*Id.*].

Although Defendants' fiscal and administrative responsibilities are undoubtedly important, the Court finds that they do not outweigh Plaintiff's First Amendment rights. As Plaintiff points out, she only seeks relief with respect to her own employment—she does not allege that the four-factor matrix is per se discriminatory or aimed to muzzle employees from exercising their First Amendment rights. [Doc. 40 at 19]. Defendants' concerns about copycat litigation disrupting the City's fiscal policy are ultimately speculative. Even if any such lawsuits arise, courts do not simply grant injunctive relief to any employee facing layoff—future litigants would still need to satisfy the factors for preliminary injunctive relief based on specific facts. And insofar as Defendants claim that granting Plaintiff a temporary injunction against her termination would "erode" the City's

18

"fiscal integrity," they have not submitted evidence to substantiate that claim. [Doc. 49 at 14]. As with the other portions of the analysis, the Parties remain free to further develop their arguments in conjunction with the Motion for Preliminary Injunction. [Doc. 40]. For now, though, the Court concludes that Plaintiff's interest in avoiding a constitutional violation satisfies the remaining two preliminary-injunction factors. *See Free the Nipple*, 916 F.3d at 807.

For the reasons set forth in this Order, the Motion for TRO is respectfully **GRANTED**. Defendants are hereby **ENJOINED** from terminating Plaintiff's employment until such time that the Court can fully adjudicate Plaintiff's Motion for Preliminary Injunction based on a more developed record and more robust legal arguments.

## CONCLUSION

For the reasons set forth above, **IT IS ORDERED** that:

(1) Plaintiff's Motion for Temporary Restraining Order [Doc. 41] is **GRANTED**;

(2) Defendants are **ENJOINED** from terminating Plaintiff's employment until the Court holds a hearing on and adjudicates Plaintiff's Motion for Preliminary Injunction [Doc. 40];

(3) On or before **September 24, 2025**, the Parties shall meet and confer with respect to (1) the appropriate timeline for holding a preliminary injunction hearing, including how long the Parties anticipate requiring for a preliminary injunction hearing; (2) whether the Parties anticipate requesting any amendments to the Scheduling Order; and (3) when the contemplated mediation has been set. The Parties **SHALL FILE** a joint status report addressing these issues no later than **September 24, 2025**.

19

DATED:  September 17, 2025         BY THE COURT:

_____
Nina Y. Wang
United States District Judge