**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Nina Y. Wang**

Civil Action No. 24-cv-02406-NYW-TPO

JESSICA CALDERON,

     Plaintiff,

v.

CITY AND COUNTY OF DENVER, OFFICE OF THE MAYOR,
BEN SANDERS, in his official and individual capacities, and
BRIAN FIROOZ, in his official and individual capacities,

     Defendants.

---

## ORDER ON MOTION FOR PRELIMINARY INJUNCTION

---

This matter is before the Court on Plaintiff's Motion for Preliminary Injunction (or "Motion"). [Doc. 40]. Defendants City and County of Denver, Office of the Mayor ("the City"); Ben Sanders ("Dr. Sanders"); and Brian Firooz ("Mr. Firooz") (together, "Defendants") have responded. [Doc. 91]. Plaintiff Jessica Calderon ("Plaintiff" or "Ms. Calderon") has replied. [Doc. 93]. This Court held an evidentiary hearing on the Motion on July 14, 2026. [Doc. 118]. For the reasons set forth in this Order, the Motion is respectfully **DENIED**.

## BACKGROUND

The Court draws these facts from the preliminary injunction record and limits its discussion of the facts to those most relevant to the Motion. Plaintiff has worked for the City in different capacities since 2004. [Doc. 43 at ¶ 3; Doc. 93-1 at ¶ 3]. From about June 2019 and at all times relevant, she worked in the City's Office of Social Equity & Innovation ("OSEI") as the Director of Operations and Innovation. [Doc. 43 at ¶ 6; Doc.

119 at 135:11–136:16]. In 2021, Ms. Calderon and Dr. Sanders worked together in OSEI, where she was his supervisor. [Doc. 91-1 at ¶ 5; Doc. 93-1 at ¶ 77].

During the 2023 mayoral election, Ms. Calderon supported Dr. Lisa Calderon ("Dr. Calderon") (no relation). [Doc. 93-1 at ¶ 17]. Dr. Calderon is the founder and leader of the Latinos United Neighbors Association ("LUNA"), a community organization. [*Id.* at ¶ 19]. Dr. Calderon did not qualify for the runoff election and endorsed Mayor Mike Johnston, who won. [*Id.* at ¶¶ 18, 23]. Mayor Johnston knew Ms. Calderon supported Dr. Calderon. [*Id.* at ¶ 22]. Once Mayor Johnston took office, Ms. Calderon applied to be Chief Equity Officer/Executive Director of OSEI ("CEO"). [*Id.* at ¶¶ 74–78]. Mayor Johnston did not select her and instead appointed Dr. Sanders as CEO in September 2023. [*Id.*; Doc. 91-1 at ¶ 2].

## I.      Ms. Calderon's Work Under Dr. Sanders

In October 2023, Ms. Calderon and Dr. Sanders attended a LUNA meeting regarding Mayor Johnston's administration. [Doc. 93-1 at ¶ 85; Doc. 91-1 at ¶¶ 10–11]. Ms. Calderon took time off work to attend. [Doc. 93-1 at ¶ 85]. At the meeting, Dr. Calderon was "highly critical" of Mayor Johnston. [*Id.* ¶ 87; Doc. 91-1 at ¶ 12]. Later, in December 2023, Dr. Sanders and Ms. Calderon had several conversations about the LUNA meeting. *See* [Doc. 119 at 89:21–90:17]. As Ms. Calderon describes it, Dr. Sanders told her she could not "be on both sides of the table" or "work for the Mayor and criticize the work of the City." [Doc. 93-1 at ¶ 90]. Dr. Sanders denies telling her she could not support Dr. Calderon or LUNA and says he merely "expressed to Ms. Calderon that it was odd" to see her sit with Dr. Calderon while Dr. Calderon criticized the Mayor's initiatives, including initiatives Ms. Calderon had worked on. [Doc. 91-1 at ¶ 14]. Ms.

Calderon asserts that she stopped attending LUNA meetings because she "believed Sanders and the City were threatening my job because of my association with Dr. Calderon and LUNA."  [Doc. 93-1 at ¶ 94].  Dr. Sanders claims he "never criticized or threatened her" and "never thought [her decision to stop attending meetings] had anything to do with [their] conversations."  [Doc. 91-1 at ¶¶ 13, 17].  He says they had no further discussions about Dr. Calderon and LUNA, [*id.* at ¶ 15], and Ms. Calderon does not reference any such conversations after January 2024, *see* [Doc. 93-1 at ¶¶ 91–94].

In February 2024, Dr. Sanders gave Plaintiff a final performance rating for 2023. [*Id.* at ¶ 96].  Her mid-year performance rating from her previous supervisor was 2.8 out of 3.0.  [*Id.* at ¶ 95].  Dr. Sanders gave her a reduced rating of 2.4, which Ms. Calderon says was "unjustified" and inconsistent with her prior reviews.  [*Id.* at ¶¶ 96–97; Doc. 93-2 at ¶¶ 11–17].  Dr. Sanders attributes the lower rating to the previous supervisor's generous rating practices.  *See* [Doc. 91-1 at ¶¶ 20–23; *id.* at 31–36].  He emphasizes that his rating still placed Plaintiff in the "Thriving" category and that he gave Plaintiff positive comments to support this rating.  [*Id.* at ¶ 22; *id.* at 31–36].

## II.     Hiring for Deputy Position

In April 2024, OSEI began hiring for its Deputy Executive Director ("Deputy") position.  [*Id.* at ¶ 24].  Plaintiff applied.  [Doc. 93-1 at ¶ 99].  She advanced to a second-round callback interview, but the interviewing panel declined to advance her to the final interview with Dr. Sanders.  [Doc. 91-2 at ¶¶ 4, 9–10].  Dr. Sanders had recused from the first three rounds of interviews and did not participate in the decision to eliminate Ms. Calderon from consideration.  [Doc. 91-1 at ¶ 24; Doc. 91-2 at ¶ 4].  Mr. Firooz and another candidate advanced to the final interview, and Dr. Sanders selected Mr. Firooz as Deputy.

3

[Doc. 91-1 at ¶ 27; Doc. 91-2 at ¶ 11].  Mr. Firooz took over as Ms. Calderon's direct supervisor in July 2024.  [Doc. 91-1 at ¶ 30].

### III.    Ms. Calderon's Work Under Mr. Firooz

Ms. Calderon asserts that Dr. Sanders continued to undermine her after the Deputy selection process concluded.  [Doc. 93-1 at ¶ 113].  This included criticizing one of her employees, excluding her from meetings, and declining to support her team's priorities and budget requests.  *See* [*id.* at ¶¶ 109, 114–18, 124–27].  Dr. Sanders sees these events differently and says his budget and management decisions were based on his business judgment.  *See* [Doc. 91-1 at ¶¶ 31–36].  On August 30, 2024, Ms. Calderon initiated this action against the City, bringing Title VII claims for discrimination and harassment based on her experiences under the prior mayoral administration.  *See* [Doc. 1].

Around that time, Ms. Calderon began making informal complaints about Dr. Sanders to Mr. Firooz.  Mr. Firooz refers to a series of one-on-one meetings with Ms. Calderon where she would "vent[]" about Dr. Sanders.  [Doc. 91-3 at ¶¶ 3, 5].  In late September 2024, Ms. Calderon told Mr. Firooz the "whole story" of her problems with past and current OSEI leadership and expressed her belief that her connections with Dr. Calderon and LUNA were a source of her tension with Dr. Sanders.  [Doc. 119 at 14:12–15:8, 210:1–9; Doc. 91-3 at ¶ 5].  After another complaint in October 2024, Mr. Firooz involved Veronica Lipsey ("Ms. Lipsey"), a City HR employee.  [*Id.* at ¶¶ 7–8; Doc. 91-2 at ¶¶ 13–14].  Ms. Calderon met with Ms. Lipsey but did not pursue her complaint through the City's formal procedures.  [Doc. 91-2 at ¶¶ 14–15].  But she renewed her complaints about Dr. Sanders to Mr. Firooz in November 2024.  [Doc. 93-1 at ¶¶ 131–32].

4

After her November 2024 complaint, Ms. Calderon asserts that Mr. Firooz began giving her "negative feedback" on her performance and, at Dr. Sanders's direction, removed her from attending Policy and Legislative Review Committee ("PLRC") meetings.  [*Id.* at ¶¶ 133–35].  Ms. Calderon and Mr. Firooz testified that the decision to remove her from PLRC meetings came from Dr. Sanders and unnamed individuals in the Mayor's Office.  [Doc. 119 at 104:18–25; 211:25–213:8].  Dr. Sanders says he determined that it was unnecessary to have three OSEI employees at PLRC meetings.  [Doc. 91-1 at ¶ 35].  As for the negative feedback, Mr. Firooz delivered feedback on November 20 about Ms. Calderon multitasking during meetings and again on December 18 about another City official's disappointment regarding Ms. Calderon's "tone and lack of professionalism" in working with a different City agency.  [Doc. 91-3 at ¶¶ 9, 18–19; *id.* at 44–45].

## IV.    Ms. Calderon Mentions Mr. Firooz in this Lawsuit

On November 20, 2024, Ms. Calderon amended her complaint in this action and added allegations mentioning Mr. Firooz.  *See* [Doc. 9 at ¶¶ 174–75].  In Ms. Calderon's telling, Mr. Firooz "angrily confronted" her "a few days after" the amendment.  [Doc. 93-1 at ¶ 139].  Mr. Firooz said she had put a "target" on him and told her, "Now you have created a hostile environment for me, and I am going to see if I can do something about it."  [*Id.* at ¶¶ 140–41].

Mr. Firooz recalls learning that he had been named in the lawsuit on November 21.  [Doc. 91-3 at ¶ 11].  He admits that he felt "personally attacked" by the lawsuit and "got emotional" when Ms. Calderon brought it up with him on December 4.  [*Id.* at ¶¶ 11, 13].  He testified that the lawsuit created what felt like a hostile work environment, and that Ms. Calderon's public allegations about his relative lack of qualifications would follow

him for the rest of his career.  [Doc. 119 at 29:14–31:1].  He says he "told Ms. Calderon I felt like I was in a hostile work environment and that I was going to seek guidance about what I should do to appropriately address and deal with my feelings."  [Doc. 91-3 at ¶ 13]. To Mr. Firooz, this did not threaten retaliation, but rather "meant talking to [a human resources] representative to determine how best to continue my working relationship with Ms. Calderon given my feelings about seeing my name in the news."  [*Id.*].

In late November or December 2024, Mr. Firooz completed Ms. Calderon's annual performance review for 2024.  *See* [Doc. 119 at 36:12–36:19].  She received the review on February 3, 2025.  [Doc. 91-3 at ¶ 24].  The rating, a 1.88 out of 3, was the lowest of Ms. Calderon's career but still placed her in the "Thriving" category.  [*Id.* at 47; Doc. 93-1 at ¶¶ 154–56; Doc. 93-2 at ¶ 24].  Mr. Firooz maintains that he completed the review "based solely on [his] observations of her work" and her own self-evaluation, and that Dr. Sanders agreed the review was consistent with his experience supervising Ms. Calderon during the first half of 2024.  [Doc. 91-3 at ¶ 21].  Ms. Calderon submitted a formal grievance disputing the review.  [Doc. 91-2 at ¶ 21; *id.* at 67–75].  Ms. Lipsey's supervisor, Debbie Hanley ("Ms. Hanley"), investigated the grievance but declined to alter the performance review.  [*Id.* at ¶¶ 22–23; *id.* at 84–88].  After follow-up discussions with Ms. Calderon, Mr. Firooz amended certain language in the review but did not change the overall rating.  *See* [Doc. 91-3 at ¶¶ 24–26; *id.* at 96–101; Doc. 119 at 121:7–16].

In mid-February 2025, Ms. Calderon says the City excluded her from recognition in a LinkedIn post and press release for a "National Digital Inclusion Trailblazers Award" received for her team's work.  [Doc. 93-1 at ¶¶ 150–53].  Mr. Firooz responds that Ms. Calderon's omission was unintentional and the result of a "misunderstanding" with the

City's public relations employee, Karen Davis ("Ms. Davis"). [Doc. 91-3 at ¶¶ 27–29]. The LinkedIn post was edited the same day to include Ms. Calderon after Ms. Calderon spoke directly to Ms. Davis. [*Id.* at ¶ 27; Doc. 119 at 150:17–151:10]. Ms. Calderon nonetheless sent Mr. Firooz a lengthy email asserting that her omission reflected retaliation and discrimination. [Doc. 91-3 at 116–19]. Mr. Firooz and Ms. Calderon then engaged in a monthslong email exchange that each interpreted differently. Mr. Firooz described his focus as on revising the press release language to Ms. Calderon's satisfaction while Ms. Calderon described the incident and the aftermath as emblematic of Defendants' continued efforts to exclude or diminish her. *See* [*id.* at 103–19].

In March 2025, Mr. Firooz and Ms. Calderon had two mediated conversations with Ms. Lipsey to address their working relationship. [*Id.* at ¶ 31]. Things "gradually improved," and Ms. Calderon stated in July 2025 that their relationship was "going well." [*Id.* at ¶ 32].

## V.    Ms. Calderon's Layoff

In May 2025, the City calculated a $200–250 million budget shortfall for the next fiscal year. [Doc. 91-1 at ¶ 40]. This required an "unprecedented mass layoff" across the City, including in OSEI. [*Id.*]. Dr. Sanders, Mr. Firooz, and Daelene Mix, the other OSEI Deputy, decided to eliminate the "Marketing and Communications" and "Operations and Innovation" subgroups within OSEI's "Equity, Strategies, and Innovation" team. [*Id.* at ¶¶ 41–42; Doc. 91-3 at ¶¶ 33–36]. Ms. Calderon led the Operations and Innovation team. [Doc. 91-1 at ¶ 43]. However, the City's layoff rules dictated that Ms. Calderon would be scored against another employee with an equivalent position to determine who would be retained. [*Id.*]. That other employee was LaQuilla Phillips-Carter ("Ms. Phillips-Carter").

[*Id.*].  Ms. Phillips-Carter led the Strategies and Learning team, a subgroup that OSEI leaders had decided to retain.  [*Id.*].  At the time, she had worked for the City for about ten months, though she had extensive experience outside the City.  [Doc. 93-2 at ¶ 43; Doc. 119 at 199:13–200:2].

The City's Career Service Board rules required the use of the Layoff Ranking Tool (the "matrix"), which used four weighted criteria for determining which employees would be laid off:  (1) Length of Service, weighted 25%; (2) Performance, weighted 10–35%; (3) Skills, weighted 10–35%; and (4) Abilities, weighted 10–35%.  [Doc. 91-1 at ¶ 43].  For OSEI's layoff decisions, the weight of Length of Service was locked at 25%, and Dr. Sanders set the weights for Performance at 10%, Skills at 30%, and Abilities at 35%, respectively.  [*Id.* at ¶ 44].  Under City rules, Mr. Firooz—Ms. Calderon and Ms. Phillips-Carter's supervisor—was tasked with evaluating the two employees' Skills and Abilities under the matrix.  [*Id.* at ¶ 45].  Each factor was graded on a scale of one to five.  [Doc. 91-3 at ¶ 40; *id.* at 158].

In applying the matrix, Mr. Firooz's aimed to "evaluat[e] who would be the best fit" to lead the Strategies and Learning team.  [*Id.* at ¶ 39].  For Ms. Calderon, Mr. Firooz assigned a score of "2 – Developing" for Abilities.  [*Id.* at 165]; *see also* [*id.* at 158].  He justifies this score based on several projects he worked on with Ms. Calderon between September 2024 and June 2025.  [*Id.* at ¶ 43].  He states she often "required prompting" and "needed to develop in communication, independent judgment, and connecting team efforts to broader agency goals."  [*Id.* at ¶¶ 42, 44].  Mr. Firooz scored Ms. Calderon as "3 – Successful" for Skills.  [*Id.* at 165]; *see also* [*id.* at 158].  While Ms. Calderon met the expectations of her role, "she needed to hone her skills in strategic design and long-range

planning," as relevant to the retained role on the Strategies and Learning team. [*Id.* at ¶ 46].

As for Ms. Phillips-Carter, Mr. Firooz assigned scores of "4 – Exceeds Expectations" for Abilities and "5 – Exceptional" for Skills. [*Id.* at 165]. Mr. Firooz explains that Ms. Phillips-Carter "consistently exceed[ed] her performance expectations," "demonstrated advanced competency," and "performed high-level strategic work" without the "constant feedback and coaching" that Ms. Calderon required. [*Id.* at ¶¶ 45, 47–48].

On July 25, 2025, OSEI leadership and HR held a meeting regarding the layoffs. [*Id.* at ¶ 52; Doc. 91-2 at ¶ 28]. There, Mr. Firooz provided his scores and comments for Ms. Calderon and Ms. Phillips-Carter. [Doc. 91-3 at ¶ 52]. Dr. Sanders reviewed Mr. Firooz's assessments and made no edits. [Doc. 91-1 at ¶ 45]. Ms. Hanley entered these scores, along with the scores for Length of Service and Performance, into the City's Layoff Ranking Tool spreadsheet. [Doc. 91-2 at ¶ 29]. Ms. Calderon scored a 5 for Length of Service and a 4 for Performance, which was calculated based on her average performance ratings between 2022 and 2024. [Doc. 91-3 at ¶ 49; *id.* at 158, 165]. Ms. Phillips-Carter scored a 2 for Length of Service and a 3 for Performance, since she had not yet received an annual performance score. [*Id.* at 158, 165]. Ms. Hanley ran the formula to calculate each employee's "Retention Score." [*Id.* at 165; Doc. 91-2 at ¶ 29]. Ms. Phillips-Carter's score was higher, so Ms. Calderon was selected for layoff. [Doc. 91-2 at ¶ 29].

On August 18, 2025, Dr. Sanders informed Ms. Calderon and eight other OSEI employees that they had been laid off. [Doc. 91-1 at ¶ 47]. He delivered the news to Ms. Calderon in a video call, with Ms. Lipsey also in attendance. [*Id.*]. At Ms. Calderon's

9

request, Ms. Lipsey and Mr. Firooz held a follow-up meeting during which Mr. Firooz explained her matrix scores.  [Doc. 91-2 at ¶ 35; Doc. 93-1 at ¶ 170].  Ms. Calderon's employment benefits were set to terminate on September 18, 2025.  [Doc. 93-1 at ¶¶ 171, 174].

## VI.    The Second Amended Complaint and the TRO

On September 12, 2025, Ms. Calderon filed a Motion for Preliminary Injunction and a Motion for Temporary Restraining Order, seeking to enjoin her termination.  [Doc. 40; Doc. 41].  She also amended her pleading again.  [Doc. 39; Doc. 43].  Her Second Amended Complaint asserts seven claims:

(1)    hostile work environment under Title VII, against the City ("Count One");

(2)    national origin discrimination under Title VII, against the City ("Count Two");

(3)    retaliation under Title VII, against the City ("Count Three");

(4)    First Amendment retaliation under § 1983 based on Ms. Calderon's support for Dr. Calderon and LUNA, against the City and Dr. Sanders ("Count Four");

(5)    sex discrimination under the Equal Protection Clause and § 1983, against the City and Dr. Sanders ("Count Five");

(6)    First Amendment retaliation under § 1983 based on Ms. Calderon's right to petition by filing this lawsuit, against the City, Dr. Sanders, and Mr. Firooz ("Count Six"); and

(7)    sex discrimination under Title VII, against the City ("Count Seven").

*See* [Doc. 43 at ¶¶ 176–284]. Ms. Calderon invokes Counts Three (Title VII retaliation), Four (First Amendment political affiliation), and Six (First Amendment right to petition) as bases for preliminary injunctive relief. [Doc. 40 at 6].

The Court heard oral argument on the Motion for Temporary Restraining Order and issued a temporary restraining order (the "TRO"). [Doc. 52; Doc. 53]. In so doing, the Court denied injunctive relief on Count Three based on Plaintiff's failure to establish irreparable harm. [Doc. 53 at 8–9]. And because Plaintiff's arguments focused only on Count Four, the Court declined to address Count Six. [*Id.* at 9 n.3]. But the Court granted relief as to Count Four. In relevant part, the Court found that Ms. Calderon had made an adequate showing that her political affiliations caused her termination, based largely on a "series of alleged antagonistic actions against Plaintiff leading up to her layoff." [*Id.* at 16–17]. The analysis, however, relied primarily on Ms. Calderon's Declaration, [Doc. 40-1], and the Court emphasized that further factual development could change its assessment, [Doc. 53 at 16–17].

Accordingly, the Court enjoined termination of Ms. Calderon's employment benefits pending a ruling on the Motion for Preliminary Injunction. [*Id.* at 19]. Ms. Calderon remains on paid administrative leave. [Doc. 91-1 at ¶ 49]. The Motion for Preliminary Injunction is now fully briefed and ripe for disposition.

## LEGAL STANDARD

Federal Rule of Civil Procedure 65 authorizes the Court to enter preliminary injunctions. Fed. R. Civ. P. 65(a). "Preliminary injunctions are extraordinary remedies requiring that the movant's right to relief be clear and unequivocal." *Planned Parenthood of Kan. v. Andersen*, 882 F.3d 1205, 1223 (10th Cir. 2018). A party seeking a preliminary

injunction must establish "(1) a substantial likelihood of success on the merits; (2) irreparable harm to the movant if the injunction is denied; (3) the threatened injury outweighs the harm that the preliminary injunction may cause the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest." *Gen. Motors Corp. v. Urban Gorilla, LLC*, 500 F.3d 1222, 1226 (10th Cir. 2007).[1]

Yet for Counts Four and Six—Ms. Calderon's constitutional claims—this analysis turns primarily on whether Plaintiff carries her burden of establishing a substantial likelihood of success on the merits. "When a plaintiff is asserting an injury in the form of a violated constitutional right, [courts] presume that the injury will be irreparable if it exists." *Ortega v. Grisham*, 148 F.4th 1134, 1142 (10th Cir. 2025) (citing *Elrod v. Burns*, 427 U.S. 347, 373–74 (1976)). In such a case, the first and second preliminary injunction factors collapse into a single inquiry, "equating likelihood of success on the merits with a demonstration of irreparable injury." *Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 806 (10th Cir. 2019). Likewise, the final two factors—balance of the equities and public interest—"merge when the [g]overnment is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). And where, as here, "a constitutional right hangs in the balance, . . . even a temporary loss usually trumps any harm to the defendant." *Free the Nipple*, 916 F.3d at 806 (quotation omitted). "[I]t's always in the public interest to prevent the violation of a party's constitutional rights." *Id.* at 807 (quotation omitted).

## ANALYSIS

As at the TRO stage, Ms. Calderon has only fully briefed the issues as to Count

---

[1] In the TRO, the Court determined that the requested injunction is not a "disfavored" injunction that requires a heightened showing. [Doc. 53 at 6–8]. Defendants do not challenge this conclusion. [Doc. 91 at 16–17].

Four—the claim for First Amendment retaliation based on her political affiliations. Nonetheless, she asserts that Counts Three, Four, and Six all supply viable bases for a preliminary injunction, [Doc. 93 at 6–7], and the Court expressly stated that it would take evidence and hear argument as to all asserted bases, [Doc. 104]. The Court addresses Counts Three and Six before turning to Count Four.

## I.    Count Three:  Title VII Retaliation

In the TRO, the Court found that Ms. Calderon did not demonstrate that her Title VII claim presents the type of "genuinely extraordinary situation" where a termination of employment inflicts an irreparable harm. [Doc. 53 at 9 (quoting *Sampson v. Murray*, 415 U.S. 61, 92 n.68 (1974))]. Ms. Calderon makes no effort to resuscitate this basis for preliminary injunctive relief in her Reply. *See* [Doc. 93]. Nor did she submit any evidence suggesting that the financial hardships caused by termination of her employment benefits would be extraordinary. *See* [*id.*]. *See generally* [Doc. 119]. Without irreparable harm, Ms. Calderon cannot obtain injunctive relief on this claim. *See Vill. of Logan v. U.S. Dep't of Interior*, 577 F. App'x 760, 766 (10th Cir. 2014) ("[A] plaintiff's failure to prove any one of the four preliminary injunction factors renders its request for injunctive relief unwarranted."). The Motion is respectfully **DENIED** as to Count Three.

## II.    Count Six:  First Amendment Retaliation Based on Right to Petition

In Count Six, Ms. Calderon contends that Defendants violated her First Amendment rights by retaliating against her for filing this lawsuit, implicating her rights under the First Amendment's Petition Clause. *See* [Doc. 43 at ¶¶ 253–76]; *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 387 (2011) ("[T]he Petition Clause protects the right of individuals to appeal to courts . . . ."). This claim is governed by the "*Garcetti/Pickering*"

13

test for retaliation claims by public employees.  *See Morris v. City of Colorado Springs*,

666 F.3d 654, 661 (10th Cir. 2012); *see also Guarnieri*, 564 U.S. at 382–83.

The *Garcetti/Pickering* test comprises five factors:

> (1) whether the speech was made pursuant to an employee's official duties;
> (2) whether the speech was on a matter of public concern; (3) whether the
> government's interests, as employer, in promoting the efficiency of the
> public service are sufficient to outweigh the plaintiff's free speech interests;
> (4) whether the protected speech was a motivating factor in the adverse
> employment action; and (5) whether the defendant would have reached the
> same employment decision in the absence of the protected conduct.

*Morris*, 666 F.3d at 661 (quotation omitted).  The first three factors are issues of law; the

last two are questions of fact.  *Id.*  Although courts refer to them as "factors," the five

elements of *Garcetti/Pickering* are all "essential" to a public employee's First Amendment

retaliation claim.  *See McNellis v. Douglas Cnty. Sch. Dist.*, 116 F.4th 1122, 1132 (10th

Cir. 2024).  Because Ms. Calderon has not established at least three of the essential

elements of the *Garcetti/Pickering* test, she fails to carry her burden to justify preliminary

injunctive relief for her First Amendment retaliation claim.

## A.    Pursuant to Official Duties

The first factor is straightforward.  For this factor, "[t]he critical question is not

whether the speech related to the official duties, but whether it was within the scope of

the employee's work tasks that the employer paid him to perform." *Pryor v. Sch. Dist. No.

1*, 99 F.4th 1243, 1255 (10th Cir. 2024).  There is no dispute that suing the City and its

officials was not part of Plaintiff's work tasks.  Therefore, the Court proceeds to the other

factors.

## B.    Matter of Public Concern

The second factor considers whether Plaintiff's lawsuit touched on a matter of

public concern. The term "public concern" is construed "narrowly." *Rogers v. Riggs*, 71 F.4th 1256, 1259 (10th Cir. 2023). "Matters of public concern are those of interest to the community, whether for social, political, or other reasons." *Morris*, 666 F.3d at 661 (quotation omitted). To determine whether protected activity involves a matter of public concern, courts consider the activity's "content, form, and context." *Rogers*, 71 F.4th at 1259 (citing *Connick v. Myers*, 461 U.S. 138, 147–48 (1983)). "[S]peech that exposes official impropriety generally involves matters of public concern." *Nixon v. City & Cnty. of Denver*, 784 F.3d 1364, 1367 (10th Cir. 2015). But "[s]peech relating to internal personnel disputes and working conditions" ordinarily does not. *Morris*, 666 F.3d at 661 (quotation omitted). "It is not sufficient that the topic of the speech be of general interest to the public; . . . what is *actually said* must meet the public concern threshold." *Nixon*, 784 F.3d at 1368 (quotation omitted). This inquiry may also "focus on the motive of the speaker and whether the speech is calculated to disclose misconduct or merely deals with personal disputes and grievances unrelated to the public's interest." *Lighton v. Univ. of Utah*, 209 F.3d 1213, 1224 (10th Cir. 2000). When assessing the speaker's motives, the relevant question is "whether the employee's *primary* purpose was to raise a matter of public concern." *Singh v. Cordle*, 936 F.3d 1022, 1035 (10th Cir. 2019). "If the speech is not a matter of public concern, then the speech is unprotected and the inquiry ends." *Couch v. Bd. of Trs. of Mem'l Hosp. of Carbon Cnty.*, 587 F.3d 1223, 1235 (10th Cir. 2009) (quotation omitted).

Plaintiff fails to address this issue in her briefing. She argues, in the context of Count Six, that "LUNA is involved in matters of public concern." [Doc. 40 at 9]. While Ms. Calderon's affiliation with LUNA might be part of the "context" of her lawsuit, her focus on

15

*LUNA's* connection to matters of public concern is unresponsive to whether the *lawsuit* dealt with a matter of public concern.  And despite having months after the TRO to refine her arguments and introduce evidence as to Count Four, *see* [Doc. 93 at 6], Ms. Calderon's reply brief skips this issue entirely.  Nor was any evidence presented at the preliminary injunction hearing addressing whether Ms. Calderon's specific employment complaints involved a matter of public concern.

"A party forfeits an issue it does not support with legal authority or argument." *Eateries, Inc. v. J.R. Simplot Co.*, 346 F.3d 1225, 1232 (10th Cir. 2003) (quotation omitted); *see also United States v. Wooten*, 377 F.3d 1134, 1145 (10th Cir. 2004) ("[Courts] will not consider such issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation." (quotation omitted)).  As the Court has previously warned Ms. Calderon, the Court has no duty to make arguments or perform legal research on her behalf.  *See* [Doc. 53 at 7 n.2, 9 n.3].  Indeed, it would be especially inappropriate to do so here.  Ms. Calderon bears the burden to establish her entitlement to the extraordinary remedy of preliminary injunctive relief.  After she failed to address this issue in her affirmative Motion, Defendants had no reason to rebut her non-existent arguments in their response brief.  If the Court shouldered Ms. Calderon's burden now, Defendants would face injunctive relief without any opportunity to offer a response.  By failing to address an "essential element[]" of Count Six, *McNellis*, 116 F.4th at 1132, Ms. Calderon cannot establish that she is substantially likely to succeed on the merits of this claim.  This independently means the Motion fails as to Count Six.

### C.    Government's Efficiency Interests

The third *Garcetti/Pickering* factor "concerns whether the government's interests,

as employer, in promoting the efficiency of the public service are sufficient to outweigh the plaintiff's free speech interests." *Duda v. Elder*, 7 F.4th 899, 912 (10th Cir. 2021) (quotation omitted). "The only public employer interest that outweighs the employee's free speech interest is avoiding direct disruption, *by the speech itself*, of the public employer's internal operations and employment relationships." *Trant v. Oklahoma*, 754 F.3d 1158, 1166 (10th Cir. 2014) (quotation omitted). The Supreme Court has observed that a government employee's lawsuit against her employer may be "particularly disruptive." *Guarnieri*, 564 U.S. at 390. "Unlike speech of other sorts, a lawsuit demands a response. Mounting a defense to even frivolous claims may consume the time and resources of the government employer." *Id.*

As with the second factor, Ms. Calderon briefly covers this issue only in connection with Count Four, with no mention of the third factor as it relates to Count Six. *See* [Doc. 40 at 9]. This issue is thus forfeited, *Eateries, Inc.*, 346 F.3d at 1232, and the Court again declines to make Ms. Calderon's arguments for her. Ms. Calderon's failure to address another essential element of Count Six further underscores the inappropriateness of extraordinary preliminary relief.

### D.    Causation

The Court addresses the fourth and fifth *Garcetti/Pickering* factors together. The fourth factor considers whether Ms. Calderon's lawsuit was a motivating factor in her termination. *See Morris*, 666 F.3d at 661. Evidence of "a long delay" or "intervening events" between the protected activity and the termination tends to undercut any inference of causation, whereas evidence that the employer "expressed opposition" to the speech may strengthen the causal connection. *Maestas v. Segura*, 416 F.3d 1182, 1189

(10th Cir. 2005). But mere speculation, or evidence that the employer simply "welcomed" "the elimination of the protected activity," does not suffice. *Id.* (quotation omitted). If a plaintiff succeeds at the fourth *Garcetti/Pickering* factor, an employer may raise an affirmative defense at the fifth factor that the employee would have been terminated even absent the protected activity. *See Trant*, 754 F.3d at 1167.

Ms. Calderon filed this action on August 30, 2024, [Doc. 1], and amended her complaint on November 20, 2024, referencing Mr. Firooz for the first time, *see* [Doc. 9 at ¶¶ 174–75]. Mr. Firooz and Ms. Calderon had a confrontation on December 4, 2024 about her naming him in her Amended Complaint. [Doc. 93-1 at ¶¶ 139–40]. Then, sometime in late November or December of 2024, Mr. Firooz completed Ms. Calderon's 2024 annual performance review and gave her a rating lower than her previous ones. *See* [Doc. 119 at 36:12–36:19, 37:23–38:2]. In February 2025, Ms. Calderon was omitted from a LinkedIn post and press release celebrating an achievement in which she took a lead role. [Doc. 93-1 at ¶¶ 150–53]. Finally, in July 2025, Mr. Firooz scored Ms. Calderon's Skills and Abilities on the matrix in a way that led to her layoff. [Doc. 91-2 at ¶¶ 28–29; Doc. 91-3 at ¶¶ 39, 52]. Ms. Calderon seeks to link these events with other workplace incidents to establish an "escalating pattern of antagonism culminating in Plaintiff's termination" in July and August of 2025. [Doc. 93 at 9]. While the Court accepted this narrative in granting the TRO, the more fully developed record reveals significant evidentiary gaps in this theory.

***Plaintiff Perceived Mistreatment Well Before She Referenced Mr. Firooz in this Lawsuit.*** First, many of the events in the alleged "pattern" cannot establish that Mr. Firooz acted with a retaliatory motive in July 2025. Ms. Calderon perceived mistreatment

18

in OSEI well before she amended her lawsuit to name Mr. Firooz.  Her issues with OSEI leadership date back to 2021, under a previous mayoral administration.  *See* [Doc. 1].  Ms. Calderon also describes various actions by Dr. Sanders that have no apparent connection to this lawsuit and did not involve Mr. Firooz.  *See* [Doc. 93-1 at ¶¶ 109–36].  Even after Mr. Firooz began as Deputy, Ms. Calderon's conflicts with him pre-date his learning that she had mentioned him in this lawsuit.  For instance, in October 2024, Mr. Firooz proposed a meeting between himself, Ms. Calderon, Dr. Sanders, and Ms. Lipsey to address Ms. Calderon's concerns about Dr. Sanders.  [Doc. 119 at 208:4–23].  Ms. Calderon characterized Mr. Firooz's proposal as a "[retaliatory] reaction."  *See* [*id.* at 208:24–209:14].  On November 20, 2024—before Mr. Firooz learned he had been mentioned in this lawsuit—Ms. Calderon asserts that he brought up "retaliatory topics" in response to her complaints about Dr. Sanders, including negative feedback about multitasking during meetings.  [Doc. 93-1 at ¶¶ 132–35].  When Mr. Firooz mentioned the multitasking, Ms. Calderon responded, "So it begins," and accused him of retaliation and "[s]ystematic oppression."  [Hr'g Ex. 121 at 2:3–3:20, 21:3–9].  Ms. Calderon's reliance on events that occurred before she referenced Mr. Firooz in this lawsuit suggests that her November 2024 amendment was not the root of any "pattern" of antagonism against her.

***Intervening Events Do Not Establish Mr. Firooz's Retaliatory Motive in July 2025.***  Second, Ms. Calderon points to two main intervening events that purportedly link her December 2024 confrontation with Mr. Firooz to her layoff in July 2025.  The first is her 2024 annual performance review from Mr. Firooz.  While Ms. Calderon received the review in February 2025, [Doc. 91-3 at ¶ 24], Mr. Firooz testified that he completed the review in late November or December of 2024, [Doc. 119 at 36:12–36:19].  So even if the

review does reflect opposition to Ms. Calderon's lawsuit, it provides little help in bridging the temporal gap between the December 2024 confrontation and the July 2025 layoff. Moreover, Mr. Firooz constructively engaged with Ms. Calderon following the review and amended certain language at her request.  *See* [Doc. 91-3 at ¶¶ 24–26; *id.* at 96–101; Doc. 119 at 121:7–16].

The second intervening event is Ms. Calderon's omission from a LinkedIn post and press release in February 2025.  [Doc. 93-1 at ¶¶ 151–53].  But by all accounts, this resulted from a miscommunication with Ms. Davis.  [Doc. 91-3 at ¶ 30; *id.* at 114–15; Hr'g Ex. 125 at 35:8–37:13].  Ms. Calderon promptly contacted Ms. Davis, who assured her the omission was unintentional and edited the post to include Ms. Calderon the same day. [Doc. 119 at 151:4–18].  Mr. Firooz had no role in the LinkedIn post and only reviewed Ms. Davis's version of the press release without making any edits.  [Doc. 91-3 at 114–16].  Ms. Calderon presented no evidence that Ms. Davis was aware of the lawsuit, that the lawsuit played any role in her inadvertent exclusion from the LinkedIn post or press release, or that her initial exclusion from the post or press release contributed to her termination or negatively impacted her employment in any way.

Other subsequent events contradict Ms. Calderon's theory of an "escalating pattern of antagonism."  [Doc. 93 at 9].  In March 2025, Mr. Firooz and Ms. Calderon attended mediated conversations with Ms. Lipsey to improve their working relationship, and Ms. Calderon stated in July 2025 that things were "going well."  [Doc. 91-3 at ¶¶ 31–32]; *see also* [*id.* at 148–50 (positive interaction between Mr. Firooz and Ms. Calderon in June 2025)].  To be sure, Mr. Firooz's workplace relationship with Ms. Calderon was sometimes fraught.  But as Ms. Calderon admits, her conduct and perception of others'

20

conduct during this time reflects her own "hypervigilan[ce]" about the retaliation and discrimination she had perceived in OSEI since 2021. [Doc. 119 at 171:5–13]. This self-described hypervigilance undercuts any inference of an escalating pattern of antagonism or coordinated effort to retaliate against her based on her interactions with other OSEI employees in early 2025. Viewing the evidentiary record as a whole, Ms. Calderon fails to establish that her Amended Complaint in November 2024 was a motivating factor in her layoff in July 2025. *See Maestas*, 416 F.3d at 1189.

***Ms. Calderon Fails to Establish that Mr. Firooz's Matrix Calculation Was Retaliatory.*** Finally, Ms. Calderon fails to establish that Mr. Firooz's matrix calculations for her and Ms. Phillips-Carter indicate a retaliatory motive. As an initial matter, Mr. Firooz did not design or control the overall matrix or the formula that calculated the "retention score" for a given employee. He only evaluated Ms. Calderon's and Ms. Phillips-Carter's Skills and Abilities. [Doc. 91-1 at ¶ 45]. Ms. Calderon claims that Mr. Firooz could not legitimately rank Ms. Phillips-Carter's Skills and Abilities higher than her own, given Ms. Phillips-Carter's short tenure with the City. [Doc. 40 at 15]. This assertion is not supported by the record. Tenure with the City was separately accounted for under Length of Service, and Ms. Calderon indeed scored higher than Ms. Phillips-Carter on that factor. [Doc. 91-3 at ¶ 49; *id.* at 158, 165].

Skills and Abilities, on the other hand, involved a *qualitative* assessment of the candidates' experience and qualifications, beyond just a *quantitative* measure of the length of City experience. The first 15 years of Ms. Calderon's tenure with the City involved case work for the Department of Human Services, and she only transitioned to full-time equity work in 2019—giving her about six years of equity experience. [Doc. 119

21

at 134:11–135:5, 135:21–136:8].  While Ms. Phillips-Carter had only worked for the City for ten months at the time of the layoff, she had nearly a decade of equity experience in higher education and as a consultant.  [Hr'g Ex. 132; Doc. 119 at 199:10–19].  And Ms. Phillips-Carter's tenure with the City, short as it was, had been spent successfully performing the exact job for which she was being evaluated, i.e. leading OSEI's Strategies and Learning team.  Mr. Firooz and Dr. Sanders both praised her performance in their hearing testimony.  [Doc. 119 at 204:10–205:13, 263:19–264:2].  Mr. Firooz described the ample positive feedback he received from Ms. Phillips-Carter's supervisees and her strong ability to collaborate with other City agencies.  [*Id.* at 230:3–18].  For Ms. Calderon, by contrast, he did not receive similarly positive feedback from her supervisees.  [*Id.* at 230:18–19].  He also referenced the November 2024 complaint from another City agency about Ms. Calderon's "lack of professionalism" in collaborating with them.  [*Id.* at 230:20–231:4; Doc. 91-3 at 44–45].  In his affidavit, Mr. Firooz further describes numerous specific projects he worked on with Ms. Calderon that underlie his scores for her Skills and Abilities.  *See* [Doc. 91-3 at ¶ 43].

Based on this evidence, Ms. Calderon fails to demonstrate that Ms. Phillips-Carter's qualifications (or lack thereof) support an inference of retaliatory motive in Mr. Firooz's matrix scores.  Across her reply brief, hours of testimony, and some thirty pages of affidavits, Ms. Calderon fails to point the Court to any evidence that Mr. Firooz's evaluation of her project-based performance was motivated by the filing of this lawsuit.[2]

---

[2] At the evidentiary hearing, Plaintiff's counsel noted that most of these projects took place in 2025, so she never had the chance to respond to them in the context of an annual performance review.  [Doc. 119 at 242:7–19].  But at the evidentiary hearing and in her briefing, Plaintiff *did* have the opportunity to respond to Mr. Firooz's assessment of her performance on these projects, and she failed to do so through the introduction of any

*See* [Doc. 93-1; Doc. 93-2].  And significantly, Ms. Calderon's theory would require this Court to conclude that Mr. Firooz—in retaliation for this lawsuit—evaluated Ms. Calderon in a certain manner for 2024, without knowledge of an upcoming layoff, and then calibrated his scores for Ms. Calderon and Ms. Phillips-Carter with the understanding that once they were input into a matrix that he did not design or control, they would yield a result that favored Ms. Phillips-Carter over Ms. Calderon.  There is simply insufficient evidence in the record to draw this series of conclusions and find that Ms. Calderon has shown a "reasonable probability" that she will ultimately succeed on the merits.  *Harmon v. City of Norman*, 981 F.3d 1141, 1146 (10th Cir. 2020) (quotation omitted).  Thus, the Motion is respectfully **DENIED** as to Count Six.

### III.     Count Four:  First Amendment Retaliation Based on Political Affiliation

In Count Four, Ms. Calderon alleges that she was terminated in retaliation for her political affiliations with LUNA and Dr. Calderon.  *See* [Doc. 43 at ¶¶ 216–41].

"The First Amendment protects public employees from discrimination based upon their political beliefs, affiliation, or non-affiliation unless their work requires political allegiance."  *Snyder v. City of Moab*, 354 F.3d 1179, 1184 (10th Cir. 2003) (quotation omitted).  "Where a government employer takes adverse action on account of an employee's political association," as opposed to her speech, the Court applies the so-called *Elrod/Branti* test.  *Jantzen v. Hawkins*, 188 F.3d 1247, 1251 (10th Cir. 1999); *see also Elrod v. Burns*, 427 U.S. 347 (1976); *Branti v. Finkel*, 445 U.S. 507 (1980).  Under this standard, a First Amendment violation occurs when "a public employee is discharged because of his or her position regarding a particular candidate for office except where the

---

contradictory evidence.

23

public employee is in a position requiring political allegiance." *Snyder*, 354 F.3d at 1184–85. Defendants do not contend that Ms. Calderon's role as OSEI's Director of Operations and Innovation required political allegiance, [Doc. 91 at 13 n.2], so the question is whether Plaintiff was fired "because of" her political affiliations.

To prove causation in this context, a plaintiff need not show that political affiliation was the "sole reason for an employee's discharge[;] it need only constitute a substantial or motivating factor." *Gann v. Cline*, 519 F.3d 1090, 1093 (10th Cir. 2008). A plaintiff can meet this standard by showing that she was "discharged to make room for a person with political sponsorship the plaintiff lacked." *Id.* at 1094 (quotation omitted). But mere speculation, or evidence that the employer simply "welcomed" "the elimination of the protected activity," does not establish causation.[3] *Maestas*, 416 F.3d at 1189 (quotation omitted).

The Court's analysis again starts with the fact that Mr. Firooz's matrix scores were the decisive factor in Ms. Calderon's layoff. Ms. Calderon fails to point to any evidence that Mr. Firooz sought to retaliate against her for her political affiliations with Dr. Calderon and LUNA when he rated her Skills and Abilities under the matrix. Ms. Calderon and Mr. Firooz discussed her political affiliations just once, in September 2024. [Doc. 119 at 210:1–9]. Ms. Calderon has not established that Mr. Firooz had any negative reaction to

---

[3] If the plaintiff shows that her political affiliation was a motivating factor, the employer may assert an affirmative defense by proving that it would have made the same decision "even in the absence of the protected conduct." *Walton v. Powell*, 821 F.3d 1204, 1211 (10th Cir. 2016) (quoting *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)). But Defendants do not assert this defense in their response brief, [Doc. 91], and unlike *Garcetti/Pickering*, this is not an essential element of an *Elrod/Branti* claim. The Court will not make Defendants' arguments for them and thus declines to reach this issue.

those affiliations.  *See* [Doc. 93-1]; *see also, e.g.*, *Quintana v. N.M. Dep't of Transp.*, No. 1:24-cv-00053-KWR-JMR, 2025 WL 2029686, at *6 (D.N.M. July 21, 2025) ("[K]nowledge [of protected activity] alone is insufficient to establish causation.").  And there is no evidence that Mr. Firooz ever referenced her political affiliation, LUNA, or Dr. Calderon in addressing Ms. Calderon's performance.  At best, she elicited testimony that Mr. Firooz overlapped with Mayor Johnston for four months at a previous employer, where he met with Mayor Johnston twice.  [Doc. 119 at 16:5–15].  It is unclear if Ms. Calderon contends that these facts gave Mr. Firooz a retaliatory animus against Dr. Calderon's supporters during the 2025 layoff.  If she does, she has failed to establish a likelihood of success on that theory.

Rather than asserting Mr. Firooz's political animus, Ms. Calderon's arguments as to Count Four focus on Dr. Sanders's alleged retaliation for her political affiliations.  To be sure, there is some evidence that Dr. Sanders opposed her attendance at the October 2023 LUNA meeting.  *See, e.g.*, [Doc. 93-1 at ¶¶ 85–90].  But there is insufficient evidence of a nexus between any opposition by Dr. Sanders and Ms. Calderon's eventual layoff, because Dr. Sanders played, at most, an attenuated role in the layoff decision.  Ms. Calderon's layoff was determined by the City's four-factor matrix.  While Dr. Sanders determined how three of the factors would be weighted, the weight of Length of Service— the exact consideration that Ms. Calderon contends was undervalued in the layoff, *see* [Doc. 93-2 at ¶¶ 30–44, 52–54]—was set by City rules, [Doc. 91-3 at 158].  Moreover, Dr. Sanders's weighting decisions for the other factors were consistent with broader City practice.  Mr. Firooz testified that most agencies weighted Performance between 10% and 15%, leaving about 30–35% to be assigned to each of Skills and Abilities.  [Doc. 119

at 232:15–233:4].    And importantly, Dr. Sanders set the factor weights *before* the Deputies had scored any employees on Skills and Abilities, so he could not have known if or how his weighting decisions would affect any particular layoff determination.[4]  *See* [Doc. 91-1 at ¶¶ 44–45].    There is no evidence that Dr. Sanders accounted for Ms. Calderon's political affiliation at all when he exercised his discretion in determining the weights of the three other factors within the confines of what the City mandated.

After setting the weights, City rules required Dr. Sanders to delegate the substantive assessment of Skills and Abilities to Mr. Firooz as the immediate supervisor of Ms. Calderon and Ms. Phillips-Carter. [Doc. 91-1 at ¶ 45; Doc. 91-3 at ¶ 39].  Mr. Firooz completed these assessments without any input from Dr. Sanders, and Dr. Sanders later reviewed Mr. Firooz's scores for Ms. Calderon and Ms. Phillips-Carter (as he did for other OSEI employees) without making any changes.  *See* [Doc. 91-1 at ¶ 45; Doc. 91-2 at ¶ 28; Doc. 91-3 at ¶¶ 39–52].    The scores were plugged into the layoff matrix formula, which resulted in a calculation that led to Ms. Calderon's layoff.  [Doc. 91-2 at ¶¶ 29–30]. Ms. Calderon fails to present sufficient evidence that Dr. Sanders acted at any step of this process to cause her termination.

At the time of the layoff, Dr. Sanders and Ms. Calderon had not discussed her political affiliations for a year and a half.  *See* [Doc. 93-1 at ¶¶ 88–94].  Nor did he make any comments around the time that reflect a retaliatory animus.  *Cf. Walton v. Powell*, 821 F.3d 1204, 1207, 1214 (10th Cir. 2016) (holding that reasonable jury could infer

---

[4] Because the precise layoff formula is not before the Court, it is unclear how heavily Dr. Sanders would have needed to weight Performance for Ms. Calderon to avoid the layoff, given the scores she received on Skills and Abilities.  In any event, this fact question appears to cut to a potential affirmative defense on but-for causation, rather than the lower "motivating factor" standard.  *See supra* note 3.

26

retaliatory motive based on temporal proximity of eight days between adverse comments and termination, plus a pattern of prior harassing comments).  And, as explained, the other incidents of alleged "intervening antagonism" in early 2025—the reduced 2024 performance review from Mr. Firooz and the LinkedIn post and press release by Ms. Davis—were caused by other employees, with little to no involvement by Dr. Sanders. Ms. Calderon thus fails to show a likelihood of success on her theory that Dr. Sanders made a high-level agency-wide decision, weeks or months before Mr. Firooz independently evaluated Ms. Calderon's Skills and Abilities, in an effort to retaliate against one employee for attending a political meeting approximately two years before.  There is simply no evidence that Dr. Sanders acted with such prescient vision.  The Motion is respectfully **DENIED** as to Count Four.

### CONCLUSION

For the reasons set forth above, **IT IS ORDERED** that:

(1)    Plaintiff's Motion for Preliminary Injunction [Doc. 40] is **DENIED**;

(2)    The temporary restraining order [Doc. 53 at 19] is **VACATED**; and

(3)    The stay of discovery and all other case deadlines [Doc. 72] is **LIFTED**.  No later than **August 5, 2026**, the Parties shall contact Judge O'Hara's Chambers for the purpose of setting new pretrial deadlines.

DATED:  July 29, 2026

BY THE COURT:

_____
Nina Y. Wang
United States District Judge

27